Filed 1/14/15  Shank v. CRST Van Expedited CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| KAREN SHANK,<br><br>    Plaintiff, Cross-defendant and Appellant,<br><br>        v.<br><br>CRST VAN EXPEDITED, INC.,<br><br>    Defendant, Cross-complainant and Appellant;<br><br>CRST INTERNATIONAL, INC. et al.,<br><br>    Defendants and Appellants. | G049844<br><br>(Super. Ct. No. SCVSS140516)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of San Bernardino County, Brian S. McCarville, Judge.  Affirmed in part and reversed and remanded in part.

Jenner & Block, Rick Richmond, Christopher C. Chiou, Jean M. Doherty and James T. Malysiak for Defendant, Cross-complainant and Appellant CRST Van

Expedited, Inc. and Defendants and Appellants CRST International, Inc. and John Wilson.

Bohbot & Riles, Karine Bohbot, Elizabeth Riles; Smith & McGinty, Daniel U. Smith and Valerie T. McGinty for Plaintiff, Cross-defendant and Appellant.

\*          \*          \*

Plaintiff Karen Shank was employed by defendant CRST Van Expedited, Inc., a company related to defendant CRST International, Inc. (collectively CRST), as a trainee truck driver.  Defendant John Wilson was plaintiff's trainer.  After plaintiff left CRST's employ, she sued defendants for, among other things, sexual harassment, and intentional and negligent infliction of emotional distress.  Pursuant to a special verdict, the jury awarded plaintiff approximately $391,000 in compensatory damages, $1.17 million in punitive damages against CRST, and $3,500 in punitive damages against Wilson.  The trial court awarded plaintiff attorney fees in the sum of not quite $433,000.

The gist of defendants' argument is there is no substantial evidence to support the award of damages.  As to the compensatory damages, they claim there is insufficient evidence of sexual harassment and intentional and negligent infliction of emotional distress.  They also maintain the court erred by admitting evidence of several other female drivers' sexual harassment complaints and by excluding evidence of a decision in a case where the Equal Employment Opportunities Commission (EEOC) had sued CRST.  Further, they argue plaintiff is not entitled to any damages based on the avoidable consequences doctrine.  Finally, they contend they should have recovered on their cross-complaint to collect tuition from plaintiff.

There is evidence of a hostile work environment sufficient to support the verdicts against all defendants.  Further, the court committed no evidentiary errors, defendants did not preserve a defense based on avoidable consequences, and the jury did not err in finding for plaintiff on the breach of contract claim.  Thus, we affirm the judgment against defendants.

Plaintiff appeals, claiming the court erred in granting defendants' judgment notwithstanding the verdict (JNOV), thereby striking the award of punitive damages. We agree there was sufficient evidence to support the award and reverse as to the punitive damages.

Plaintiff also asserts the court abused its discretion when it reduced the claimed hourly rate and failed to use a multiplier in calculating her attorney fees. We are not persuaded and affirm the amount of attorney fees awarded.

## FACTS AND PROCEDURAL HISTORY

CRST operates a nationwide shipping company using trucks operated by two drivers. Training of a new driver includes 28 days on the road with a lead driver, whose responsibilities include day-to-day supervision, evaluation and recommendation as to whether the trainee is qualified and should be hired. The lead driver has no authority to hire, promote, discipline, or terminate the trainee. A fleet manager supervises both the lead driver and the trainee and is their direct supervisor.

Tuition at the time plaintiff became a trainee was apparently $3,600.[1] CRST advances tuition in exchange for the trainee's agreement to work for the company for at least six months after completion of training and licensing. The trainee reimburses tuition through payroll deductions during that six-month period.

Plaintiff began training with Wilson as her lead driver. From the first day of training Wilson made comments to plaintiff, including: he "didn't have a problem" helping her buy "female products"; "[w]hat happens on this truck, stays on this truck"; "[w]hat happens between two consenting adults is nobody's business but theirs"; "if [plaintiff] had a hammer and nail," "he had the wood"; and if a man who had approached the truck came "knocking while we are making whoopie," Wilson would "beat his ass."

---

[1] Neither party cites to the record to support this but neither disputes the amount.

3

Plaintiff responded with statements such as "no," "shut up," or "[t]hat's not going to F-ing happen."

Wilson asked plaintiff if she had a vibrator with her and she told him no. He also "constantly ask[ed] if he could tickle [plaintiff]. At times he would reach over and he would put his finger out like he was going to tickle [her]," saying he "gets frisky when he gets bored." Plaintiff told him "no." One night when she put her sweatshirt on over her tank top Wilson asked why she "didn't give an old man a cheap thrill."

Once Wilson "caressed" plaintiff's hand when she reached out to take an ashtray from him. Other times he caressed her leg as she stepped up to the top bunk in the truck. Although she moved her foot from him, plaintiff never told Wilson to stop touching her. She said nothing because she "was there to drive the truck."

Plaintiff became drunk one evening at a bar and Wilson walked her back to her motel room. To thank him, plaintiff kissed him on the cheek. When she came out of the bathroom after washing her face, Wilson was in the room naked. He grabbed plaintiff and kissed her, after which plaintiff pushed him away and ran to the bathroom to throw up. Wilson said he was leaving "if all [she] was going to do was get sick." Plaintiff did not report this to CRST at the time.

Several days later, when the truck needed repairs, plaintiff and Wilson again had to stay at a motel, and took one room with a single bed. CRST would have charged them half of the additional cost if they stayed in separate rooms. Around bedtime, Wilson asked if he "could get comfortable," and, after taking a shower, came out of the bathroom "buck naked" and "crawled into" bed. Plaintiff said she "was in shock," but "[i]gnored him." After showering, dressed in a T-shirt and pajama pants, she sat on the side of the bed to write "something."

At some point, Wilson began rubbing plaintiff's stomach. She said something to him about it. And the next thing she remembers was Wilson "on top of [her] and inside of [her]." She did not scream or push him away because she "froze."

4

She remembers "lying there and staring at the curtains" and being "pretty much blank." She did not report the incident at the time; she blamed herself for what had happened because she had been raped twice years ago.

After the training period was completed, plaintiff filled out a standard evaluation of Wilson and did not mention any of the sexual comments or touching or the intercourse. Wilson recommended to the fleet manager that plaintiff be approved as a driver.

In May 2005 plaintiff began driving with Jeff Cotter as a codriver. He set up the bunk beds on the truck so that only the bottom bunk could be slept on. Plaintiff told him to put the top bunk down. After one day driving with Cotter plaintiff left the truck.

She called her fleet manager, Todd Bruns, and told him she wanted to quit CRST because she would not "put [herself] in the same position to be sexually harassed." She complained Cotter wanted a "boyfriend-girlfriend relationship," not a "professional relationship." Plaintiff also told Bruns Wilson had engaged in some inappropriate conduct and made sexual comments. Bruns suggested she think about it for a couple of days; plaintiff agreed. Bruns removed plaintiff from Cotter's truck and gave her a list of other lead drivers she could request. The next day plaintiff e-mailed Bruns complaining Cotter was not a safe driver.

Bruns put a notation in CRST's computer system prohibiting Cotter from driving with women in the future, but did not take any action regarding Wilson. Although the Human Resource Guidelines for Fleet Managers required managers to inform the human resources department if they believed an employee was making a harassment complaint, Bruns did not report plaintiff's complaints about Cotter or Wilson to CRST's human resources department. The human resources department at that time

5

was headed by James Barnes, the human resources director,[2] and Lisa Oetken, the human resource generalist. Bruns admitted plaintiff had "taken herself off the truck and wanted to quit," "not only because of her experience with . . . Cotter, but because of a bad experience she had with her prior trainer." CRST conducted no investigation of Wilson or Cotter.

A few days after speaking with Bruns, on May 16 plaintiff sent a two-page resignation letter to CRST. She stated that from the beginning of her employment she had "been subject to the overall feelings, that in order to be an effective co-driver I would be required to sleep with a male co-driver or kicked off the truck." She added, "[i]t is a known fact and even the fleet managers advised [another woman driver] to interview co-drivers as a potential romantic interest as platonic relationship teams do not work."

She documented problems with the truck she drove with Cotter. She also complained Wilson failed to properly train her. She went on to state he asked her "if [she] wanted to run with him as we did get along fairly well." The last sentence of this paragraph stated Wilson had asked several times if he could tickle her and her response was that "he needed to stop and [her] answer was NO."

At least one full page of her letter detailed expenses she had incurred and the time and mileage during her training period. She claimed CRST owed her approximately $300.

Plaintiff concluded the letter by saying defendants had taken advantage of her because she was both a woman and a new driver. She explained she was uncomfortable with "the comments and the attitudes of the potential male co-drivers" and

_____

[2] Barnes was an employee of defendant CRST International, Inc, the parent of defendant CRST Van Expedited, Inc. CRST International did not employ drivers but provided support services to related companies, including defendant CRST Van Expedited, Inc. The jury found the two companies were so interrelated and had sufficient common ownership, management, and control of employees as to be treated as one employer.

understood "female drivers [could] be just as bad. I am not in this industry to be thrown off a truck in the middle of the night or, in the middle of nowhere, or to be made to feel as if my job depends on if I sleep with someone. Most importantly, I did not accept employment with your company to lose more money than I make." CRST took no action at that time.

In early June 2005 plaintiff received a collection notice for her $3,600 tuition fee and called CRST to dispute the charge. During the discussion she told Theresa Homsey, CRST's collection representative, she should not have to pay because she was sexually harassed and Wilson had raped her. Homsey laughed and said she could not do anything about it without a police report.

Homsey reported to Oetken that plaintiff claimed she had been sexually harassed during the course of her employment. Oetken then called plaintiff. When she asked for the details of the harassment, plaintiff told her the information was in her resignation letter. Oetken told plaintiff "she couldn't do anything without a police report," and "there was nothing they could do because [plaintiff] no longer worked there."

After this conversation Oetken obtained a copy of plaintiff's resignation letter. Her overall reaction to the letter, looking at it in context, was that plaintiff was describing her feelings and opinions and except for the tickling, did not state anything had happened. As to the tickling, Oetken was not concerned because the statement was in the same paragraph where plaintiff stated she got along "fairly well" with Wilson. And Oetken knew CRST did not encourage romantic relationships between codrivers. According to Oetken, there was just not much substance to these complaints.

Oetken believed plaintiff's concrete concerns were she had not been properly trained, the equipment was substandard, and she was owed money. This confirmed Oetken's understanding of her phone conversation with plaintiff where she was concerned about the demand for her tuition. This was Oetken's determination as to

7

the statements voiced in the resignation letter. Oetken never called plaintiff to advise all of her conclusions.

Thereafter Oetken obtained the copy of plaintiff's e-mail to Bruns. She never reviewed plaintiff's file to see who had been her lead driver.

In August 2005, plaintiff filed a charge against CRST with the EEOC. It stated she had been sexually harassed by Wilson by "comments, touching, and a sexual encounter." Plaintiff also stated she had reported the harassment "to management" but "nothing was done."

This was the first time Barnes learned of plaintiff's complaints. At that point he began an investigation, with Oetken's assistance. Oetken advised him she had investigated plaintiff's original claim in early June. Oetken provided Barnes with copies of plaintiff's letter of resignation and her own investigation notes.

Barnes's reaction to plaintiff's letter of resignation was not that she had made a complaint but that her statements were only "her opinions," "not a known fact to [him]."

Neither Barnes nor Oetken contacted plaintiff. On the advice of counsel, it was CRST's policy not to do so if an EEOC charge was filed. Barnes spoke to Bruns, the fleet manager and Oetken would have already spoken to Homsey regarding her conversation with plaintiff.

Barnes asked Oetken to speak with Wilson. She contacted him by phone and she asked him if he had touched plaintiff, which he denied. Her notes did not reflect whether she asked him if he had tickled plaintiff, made inappropriate sexual comments, or had any "sexual encounter" with plaintiff, although she did her "best to write everything down." Oetken reminded Wilson of CRST's policy, which she thought was the "appropriate disciplinary action."

Barnes did not know whether Oetken told Wilson plaintiff had complained about sexual harassment but assumed so. Although it was CRST's practice to contact

8

women who had driven with a male driver accused of sexual harassment, neither Barnes nor Oetken contacted any women who had driven with Wilson.

After resigning from CRST, plaintiff worked as a truck driver for another company for approximately one month before leaving because she "wasn't functioning." She later started therapy because she "wasn't really functioning as a person." Plaintiff had "flashbacks," "couldn't get thoughts out of her mind," and had "problems with sleep." She was diagnosed with posttraumatic stress disorder.

Plaintiff's treating physician described her as "emotionally or psychologically damaged as a result of her employment at CRST." Although plaintiff had a prior history of anxiety and depression, she still had been able to work, "which [was] in sharp contrast to [after CRST]," when she could not work.

In August 2006, plaintiff filed this action, alleging causes of action for breach of contract, breach of the covenant of good faith and fair dealing, unlawful sex discrimination, failure to maintain an environment free from harassment against all defendants, wrongful termination against CRST, and assault and battery against Wilson.

Barnes testified this was the first time he knew plaintiff was accusing Wilson of sexually assaulting her. Barnes then interviewed Wilson; this was the first time he had done so. He told Wilson the complaint alleged sexual assault and asked whether that had happened. Wilson denied it. Barnes "would have" asked about the allegations in the EEOC charge as well, even though Oetken had previously interviewed Wilson. He did not speak to Wilson face to face but only interviewed him by phone. He testified he did not need to see Wilson to judge his credibility.

Per his notes, Barnes's concluded plaintiff's complaint came "down to money." While she was driving with Wilson she had indicated she did not want to pay her tuition. His notes also showed the names of two women who had driven with Wilson. Although he was unsuccessful in contacting them, Oetken did at a later time. She also talked to three other women whose names were not on his list.

9

Plaintiff's expert witness testified CRST did not conduct a proper investigation of plaintiff's complaints.

After trial, pursuant to a special verdict, the jury found Wilson and CRST liable for intentional and negligent infliction of emotional distress and sexual harassment and awarded plaintiff just over $391,000 in compensatory damages. It also awarded $3,500 in punitive damages against Wilson and $1.17 million in punitive damages against CRST. In granting defendants' motion for JNOV, the court found there was insufficient evidence of fraud, malice or oppression and struck the punitive damages award against CRST. CRST did not prevail on its cross-complaint to recover the tuition.

Additional facts are set out in the discussion.

## DISCUSSION

### DEFENDANTS' APPEAL

### 1. *Substantial Evidence*

Where there is a sufficiency of the evidence argument, we start with the presumption the judgment is correct. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.) "'[T]he evidence [is viewed] in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference. [Citation.]'" (*Id.* at pp. 957-958) If "'"there is any substantial evidence, contradicted or uncontradicted," to support the findings,'" we must uphold that finding even if we would have made a different finding had we presided over the trial. (*Ibid.*) We may not reweigh or resolve conflicts in the evidence or redetermine the credibility of witnesses. (*Citizens Business Bank v. Gevorgian* (2013) 218 Cal.App.4th 602, 613.)

### 2. *Hostile Work Environment*

#### a. *Introduction*

Under the Fair Employment and Housing Act (FEHA; Govt. Code, § 12940 et seq.) one type of sexual harassment is "'"hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and

10

create an abusive work environment.'"  [Citations.]"  (*Hughes v. Pair* (2009) 46 Cal.4th 1035, 1043.)  Sexual harassment based on a hostile working environment exists when an employee is subjected to unwelcome sexual harassment based on gender that is sufficiently severe or pervasive so as to create an abusive or hostile working environment.  (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462.)  "[S]exual harassment, which is defined as 'verbal, physical, or sexual behavior directed at an individual because of her, or his, gender,' . . . includes, but is not limited to, conduct which is verbal (such as epithets, derogatory comments or slurs), as well as physical and visual insults.  [Citations.]"  (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476-477.)

> ### b. Wilson's Liability

Wilson contends there is insufficient evidence to show his sexual advances were unwelcome or his conduct was severe or pervasive enough for an actionable claim.  We are not persuaded.

Substantial evidence shows at least some of defendant's sexual advances were unwelcome.  In response to defendant's sexual remarks, plaintiff rejected defendant by responding, "no," "shut up," or "That's not going to F-ing happen."  When Wilson grabbed and kissed plaintiff, she pushed him away.

Wilson argues plaintiff consented to his conduct because the jury did not find him liable for assault and battery.  We do not see the connection.  The jury's rejection of assault and battery was based on Wilson's lack of intent to do an act that would result in harmful or offensive conduct.  (*Piedra v. Dugan* (2004) 123 Cal.App.4th 1483, 1495 [intent is element of battery]; *So v. Shin* (2013) 212 Cal.App.4th 652, 668 [same re assault].) The jury made no findings plaintiff consented to Wilson's conduct.

Defendant also argues he did not have intercourse with plaintiff.  But there is evidence to the contrary.  However, even if the jury believed sexual intercourse took

11

place, he contends, plaintiff's testimony shows it was consensual because she did not explicitly object or resist. But, absence of resistance is not a conclusive showing of consent. (*People v. Barnes* (1986) 42 Cal.3d 284, 299.) Some women become immobilized in the face of sexual assault. "[F]rozen fright" response can resemble cooperative behavior but does not necessarily amount to a consensual act. (*Id.* at pp. 299, 306.)

Plaintiff stated she "froze" and went "blank" during the sexual act. When defendant said he wanted plaintiff to have an orgasm, she replied "that [isn't] going to happen." From her testimony, the jury could have reasonably inferred the sexual intercourse was unwelcome. And it is the province of the jury, not the appellate court, to resolve conflicts in the evidence and to determine the credibility of witnesses. (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp.*, *U.S.A.* (2013) 221 Cal.App.4th 867, 877.)

We reject Wilson's contention that if his conduct were actually unwelcome, plaintiff would have complained sooner. *Bundy v Jackson* (D.C. Cir. 1981) 641 F.2d 934 recognized "the special importance of allowing women to sue to prevent sexual harassment without having to prove that they resisted the harassment and that their resistance caused them to lose tangible job benefits. [Citation.]" (*Id.* at p. 945.)

Although plaintiff did not file a complaint until after she finished driving with Wilson, her resignation letter to CRST indicates that she may have feared loss of employment benefits or retaliation if she had complained of Wilson's conduct: "I am not in this industry to be thrown off a truck in the middle of the night or, in the middle of nowhere, or to be made to feel as if my job depends on if I sleep with someone."

Plaintiff also testified as to why she didn't just get off the truck after the alleged rape, "I had six days [of training] left. . . . I was in the middle of . . . [s]omewhere in Minnesota. God knows where." "Sounds bad [because it's like I didn't care about my own safety], but I wanted to finish my training." A reasonable jury could infer that,

12

rather than welcoming Wilson's conduct, plaintiff delayed complaining because she feared her training would be jeopardized.

Wilson also challenges the sufficiency of the evidence that his conduct was severe or pervasive. Pervasive or severe conduct is such that would interfere with a reasonable employee's work performance and psychological well-being. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 609-610 (*Fisher*).) Whether the sexual conduct complained of is sufficiently pervasive to create a hostile or offensive work environment must be determined from the "totality of the circumstances." (*Ibid.*)

The factors to be considered in evaluating the totality of the circumstances are: (1) the nature of the unwelcome sexual acts or words (generally, physical touching is more offensive than unwelcome verbal abuse); (2) the frequency of the offensive encounters; (3) the total number of days over which all of the offensive conduct occurred; and (4) the context in which the sexually harassing conduct occurred. (*Fisher*, *supra*, 214 Cal.App.3d. at p. 610.) "'The required level of severity or seriousness "varies inversely with the pervasiveness or frequency of the conduct." [Citation.]'" (*Mokler v. County of Orange* (2007) 157 Cal.App.4th 121, 142.)

Neither of the cases Wilson cites supports the position his acts did not reach the threshold of severe or pervasive sexual harassment. *Hughes v. Pair*, *supra*, 46 Cal.4th 1035 was based on Civil Code section 51.9, which prohibits sexual harassment in certain business relationships outside the workplace. The defendant was the trustee of a savings account belonging to the plaintiff's son. Thus the case is already distinguishable.

Further, there were only two offensive encounters. The first was a telephone conversation in which the defendant used terms of endearment to express interest in the plaintiff and alluded to the fact that he might allow her to use the trust savings. He stated, "'You are one of the most beautiful, unattainable women in the world. Here's my home telephone number and call me when you're ready to give me what I want.'" (*Hughes v. Pair, supra,* 46 Cal.4th at p. 1040.) In the second instance, the

13

defendant told the plaintiff at a social gathering, "'I'll get you on your knees eventually. I'm going to fuck you one way or another.'" (*Ibid*.) The Supreme Court did not find these isolated incidents sufficiently severe or pervasive to qualify as sexual harassment. (*Id*. at pp. 1048-1049.) Here, by contrast, we have more than two offensive encounters inside the workplace.

Similarly, *Mokler v. County of Orange, supra,* 157 Cal.App.4th 121 demonstrates conduct falling short of severe or pervasive harassment. The defendant, a member of the county board of supervisors, did not supervise the plaintiff and did not work in the same building as she did. The alleged harassment involved three incidents occurring over a five-week period.

In the first incident, the defendant called the plaintiff an "'aging nun'" when he learned she was not married. (*Mokler v. County of Orange*, *supra*, 157 Cal.App.4th at p. 144.) In the second, the defendant took the plaintiff by the arm, pulled her to his body, told her she had a nice suit and nice legs, and looked her up and down. (*Ibid*.) The third incident, the most serious, occurred when the defendant put his arm around the plaintiff, rubbing it against her breast in the process, and asked for her home address. (*Ibid*.)

*Mokler* held, "Taken as a whole, the foregoing acts demonstrate rude, inappropriate, and offensive behavior. To be actionable, however, a workplace must be "'permeated with 'discriminatory intimidation, ridicule and insult,' [citation] that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment.'"" [Citation.]" (*Mokler v. County of Orange, supra,*157 Cal.App.4th at p. 145.)

Defendants claim *Mokler* holds "the absence of physical threats by the alleged harasser established that the alleged harassment was not severe or pervasive." This is a far stretch from the court's actual holding that "[the three] acts of harassment [fell] short of establishing 'a pattern of continuous, pervasive harassment' [citation],

14

necessary to show a hostile working environment under FEHA." (*Mokler v. County of Orange*, *supra*, 157 Cal.App.4th at p. 145.)

*Hughes* and *Mokler* have little relevance to the current case. The alleged harassers in those cases did not supervise the plaintiff's work, and their conduct did not pervasively impact the plaintiff's work environment. Unlike the current case where plaintiff was required to constantly be in close proximity to Wilson, either in a truck cab driving during the day or sleeping in truck bunks or hotel beds during the night, the plaintiffs in *Hughes* and *Mokler* did not interact with the defendants on a daily basis. The nature of plaintiff's trucking job made Wilson's conduct pervasive in the sense that he was in her work environment morning, noon, and night, seven days a week.

Furthermore, there were no allegations of physical advances in *Hughes*, and the allegations of physical contact in *Mokler* were substantially less severe than unwelcomed sexual intercourse. Even excepting the sexual intercourse, the physical advances in the current case, e.g., caressing of plaintiff's leg on multiple occasions; kissing her without permission; and "constantly" asking to tickle her while extending a finger towards her, were more pervasive than those in *Mokler*.

Wilson contrasts his conduct with that outlined in *Sheffield v. Los Angeles County Dept. of Social Services* (2003) 109 Cal.App.4th 153, where the court found severe or pervasive misconduct. In *Sheffield*, a coworker made sexual advances toward the plaintiff, threatened her with physical violence, and then attacked her, hitting her on the head and neck, at work. While the defendant's conduct was considered "severe," the court did not hold that threats or violence *must be present* for harassing conduct to be "severe or pervasive." Moreover, that case involved overt violence and thus has little relevance to the facts in the instant case.

On facts more similar to the current case, the court in *Fuentes v. AutoZone, Inc.* (2001) 200 Cal.App.4th 1221 found sufficient evidence of conduct that was severe or pervasive enough to create a hostile work environment. The defendants, acting store

15

manager and sales manager, respectively, made ongoing profane sexual comments about a speculative relationship between the plaintiff, a retail employee, and a coworker. The defendants also spread a rumor among other employees that the plaintiff had herpes. In one instance, the sales manager grabbed the plaintiff's hand to spin her around at the cashier counter, saying, ""Show your butt to the customers and that way you can sell more."" (*Id.* at p. 1227.) The customers laughed, taunted, and cheered her on in response to this action. Later that day when one of the earlier customers returned, the manager said, ""Get ready for them,"" implying the plaintiff should spin around again. (*Ibid.*) The court held the defendants' conduct was severe or pervasive enough to create a workplace ""'permeated with "discriminatory intimidation, ridicule and insult" [citation].'"" (*Id.* at p. 1237.)

Wilson's conduct exceeds the threshold of "severe or pervasive" conduct found in *Fuentes*. Both Fuentes and plaintiff were subjected to repeated offensive remarks. Plus, in the current case, plaintiff was subjected to unwelcome sexual advances. The verbal and physical advances were more pervasive for plaintiff here because she lived in her work environment.

In conclusion, there is substantial evidence to support the jury's finding that the single instance of sexual intercourse was sufficiently severe or the other harassing conduct was sufficiently "pervasive," or both, to hold defendant liable for hostile work environment sexual harassment.

*c. CRST's Liability*

Under FEHA an employer is strictly liable for harassing conduct of its agents and supervisors. (*Fisher*, *supra*, 214 Cal.App.3d 590; 29 C.F.R. § 1604.11(d).) Defendants challenge the jury's finding Wilson was a supervisor, relying on *EEOC v. CRST Van Expedited, Inc.* (8th Cir. 2012) 679 F.3d 657, 684, which held CRST's lead drivers are not supervisors. But that case was a federal Title VII claim (Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 2000e et seq.; Title VII), which has a different

16

definition of supervisor, and was not a FEHA case. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1040 ["explicit differences between [Title VII] and the FEHA 'diminish the weight of the federal precedents'"].)

FEHA defines "supervisor" as "any individual having the authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or the responsibility to direct them, or to adjust their grievances, or effectively to recommend that action, if, in connection with the foregoing, the exercise of that authority is not of a merely routine or clerical nature, but requires the use of independent judgment." (Gov. Code, § 12926, subd. (t).)

*Chapman v. Enos* (2004) 116 Cal.App.4th 920 is instructive as to who qualifies as a supervisor under FEHA. In *Chapman* the plaintiff, an investigator for the district attorney's office, sued the county and a deputy district attorney, Enos, for sexual harassment. Enos was responsible for directing the plaintiff's work and day-to-day activities. The chief investigator used feedback from Enos to evaluate the plaintiff's work performance. Despite the fact Enos had no authority to hire or fire, promote or transfer the plaintiff, the court found sufficient evidence Enos was the plaintiff's supervisor within the FEHA definition.

The court explained, "while full accountability and responsibility are certainly indicia of supervisory power, they are not required elements of . . . the FEHA definition of supervisor. Indeed, many supervisors with responsibility to direct others using their independent judgment, and whose supervision of employees is not merely routine or clerical, would not meet these additional criteria though they would otherwise be within the ambit of the FEHA supervisor definition." (*Chapman v. Enos, supra,* 116 Cal.App.4th at p. 930, italics omitted.)

Here, the evidence supports a finding Wilson was plaintiff's supervisor for purposes of the FEHA claim. Plaintiff believed Wilson was her supervisor. As lead driver, Wilson assigned plaintiff's daily routine activities for the 28-day training period.

17

At the end of that period, he evaluated plaintiff's driving. Wilson stated that "as the lead" "part of [his] role [was] to make recommendations about the trainee's continued employment with CRST, meaning whether they can graduate from being a trainee" or whether they "shouldn't pass." He also testified that in the past, when he "recommended that a trainee of [his] be terminated," "that trainee was terminated."

Barnes admitted "th[e] lead driver/student driver relationship is really no different than the role of supervisors in other industries." Wilson's fleet manager agreed the evaluation from the lead driver was "one of the main tools used to determine whether a [student] driver could become" a "driver." Wilson's feedback had at least as much influence over plaintiff's continued employment as Enos's feedback had about the plaintiff in *Chapman*.

Contrary to defendants' claim, Wilson's responsibilities were not merely "'routine or clerical'" but did "'require the use of independent judgment.'" Because there is substantial evidence Wilson was plaintiff's supervisor under a FEHA cause of action, CRST is strictly liable for Wilson's sexual harassment.

3. *Challenges to Other Causes of Action*

Defendants challenge the sufficiency of the evidence to support the award of damages on the other causes of action for failure to maintain an environment free from harassment, intentional infliction of emotional distress, and negligent infliction of emotional distress. The award of compensatory damages for sexual harassment based on a hostile work environment discussed above is the same as the award for these other three causes of action. Therefore, we need not discuss the sufficiency of the evidence to support those claims.

4. *Evidentiary Issues*

Defendants challenge two specific evidentiary rulings by the trial court: admission of evidence of sexual harassment complaints by other female CRST drivers ("me-too" witness evidence) and exclusion of a federal EEOC pattern or practice sexual

18

harassment case brought against CRST. Given the trial court's broad discretion to admit and exclude evidence, these claims fail. (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1513 [ruling affirmed unless trial court exceeds "'"'bounds of reason"'"'"].)

### a. Admission of "Me-too" Witness Evidence

Defendants contend the trial court erroneously admitted evidence that eight other female drivers at CRST ("me-too" witnesses) also complained of harassment, some before and some after plaintiff's complaint. The trial court found this evidence had "independent probative value" "under Evidence Code [s]ection 1101(b)," which permits "admission of evidence that a person committed a . . . civil wrong, or other act when relevant to prove some fact (such as motive, intent . . . plan, or knowledge) other than his disposition to commit such an act." (See *Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 110 [me-too evidence in a sexual harassment case probative under Evidence Code section 1101(b) to show discriminatory intent].)

The jury was instructed it could consider the me-too evidence "only for the limited purpose of considering whether CRST . . . took reasonable steps to prevent discrimination and harassment from occurring and not for any other purpose such as whether the underlying allegations reported by the female drivers were true or untrue."

Defendants argue the me-too evidence prejudiced the jury's finding that CRST "failed to take reasonable steps" "'to prevent and correct workplace sexual harassment.'" But there was other sufficient evidence to support the judgment against defendants. As we will discuss in the punitive damages section below, CRST's failure to properly investigate ratified Wilson's conduct.

Defendants also challenge the evidence of one particular me-too witness, Janet Ranney, who drove with Wilson two years after plaintiff. They argue evidence he harassed her is not admissible to show he harassed plaintiff. Moreover, they assert, his actions toward Ranney were dissimilar and too remote in time to be admissible. But

19

again, there was more than enough evidence of Wilson's conduct toward plaintiff to support the verdict without the Ranney testimony. We need not decide if her testimony was erroneously admitted, because if it was, any error was harmless.

In addition, defendants contend admission of the me-too evidence, especially testimony as to two of the witnesses, improperly supported the jury's decision to award punitive damages. As discussed below, there was other evidence sufficient to uphold that award. Therefore, even were we to assume the me-too evidence should not have been admitted, the error was harmless.

### b. Exclusion of EEOC Case

Defendants contend the court erroneously failed to admit "the EEOC" case, presumably *EEOC v. CRST Van Expedited, Inc.* (N.D. Iowa 2009) 611 F.Supp.2d 918 (*EEOC v. CRST*), into evidence. They sought not only to inform the jury of the finding in their favor but also to be allowed to use the case in cross-examining plaintiff's expert to impeach his opinion. The court did not abuse its discretion by excluding this case.

In *EEOC v. CRST* the EEOC brought a Title VII class action against CRST on behalf of female employees, alleging CRST had a pattern or practice of sexual discrimination resulting in a hostile work environment. The judge held there was insufficient evidence to support EEOC's claim and granted the defendant's motion for summary judgment. (*EEOC v. CRST*, at p. 958.)

Defendants argue this case was relevant to rebut both the FEHA hostile work place environment claim and the FEHA failure to maintain an environment free from harassment claim. But the federal finding on a "pattern or practice" claim is not dispositive as to either of these FEHA claims.

First, the pattern or practice claim in *EEOC v. CRST* case was brought under Title VII. While there are some similarities between federal and state sexual harassment law, there are significant differences for a pattern or practice claim under FEHA versus Title VII. Thus the relevance of the case is questionable.

20

Second, a pattern or practice cause of action requires a different factual finding than a cause of action for creating or failing to prevent harassment. "To prove a pattern or practice claim," the plaintiff "must 'establish [that] discrimination was the company's standard operating procedure—the regular rather than the unusual practice.'" (*EEOC v. CRST*, *supra*, 611 F.Supp.2d. at p. 931.) Therefore, in that case, the EEOC was required and failed to present sufficient evidence to show CRST discriminated against many women. (*Id*. at p. 954.) That the EEOC could not meet that burden of proof has no bearing on whether there is sufficient evidence to prove CRST discriminated against plaintiff in this case.

*EEOC v. CRST* is also irrelevant for rebuttal of the me-too witness testimony. Those witnesses were not parties in *EEOC v. CRST*, so the findings shed no light on the specific facts pertaining to how their individual complaints were handled. As the court acknowledged in that case: "Much less clear is . . . CRST's responses to each complaint. The parties have not compiled this evidence in any meaningful way for the court." (*EEOC v. CRST*, *supra*, 611 F.Supp.2d. at p. 947.) Furthermore, there was sufficient evidence without the me-too evidence, and thus it was irrelevant whether the me-too evidence was rebutted.

5. *Compensatory Damages under the Avoidable Consequences Doctrine*

Defendants argue plaintiff is not entitled to any compensatory damages from CRST under the avoidable consequences doctrine. The elements of this defense in a FEHA sexual harassment claim are: (1) the employer took reasonable steps to prevent and correct workplace sexual harassment; (2) the employee unreasonably failed to use the preventive and corrective measures the employer provided; and (3) reasonable use of the employer's procedures would have prevented at least some of the harm the employee suffered. (*State Dept. of Health Services v. Superior Court*, *supra*, 31 Cal.4th at p. 1044.) The defense applies to an employer's strict liability based on harassment by a supervisor. (*Id.* at p. 1042.)

21

In the negligent infliction of emotional distress cause of action, the jury found plaintiff could have avoided 50 percent of her damages.  The jury was not presented with this question regarding any other cause of action.

Defendants maintain, however, that the avoidable consequences doctrine voids all the FEHA damages, not just the 50 percent found by the jury.  But this issue is not properly before us.

A party may not argue on appeal that damages are excessive without first having made a motion for new trial.  (*Greenwich S.F., LLC v. Wong* (2010) 190 Cal.App.4th 739, 759.)  "'The theory is that trial courts are in a better position than appellate courts to resolve disputes over the proper amount of damages.  [Citations.]'" (*Ibid*.)

Defendants did not cite to any evidence showing they challenged the amount of compensatory damages via a motion for new trial.[3]  The appellant's appendix does not contain copies of any posttrial motion.  The reporter's transcript details the arguments on, among other things, defendants' JNOV motion and their motion for new trial.  We reviewed these arguments and found no mention of a challenge to the amount of compensatory damages.[4]  Thus, defendants failed to satisfy the prerequisite to arguing excessive compensatory damages on appeal.

*6.  Breach of Contract*

Defendants sued plaintiff for breach of her employment contract based on her failure to repay CRST the $3,600 tuition.  To recover on a breach of contract claim, a party must prove, among other things, it performed all of the required conditions or an

---

[3]  Based on defendants' failure to direct us to anything in the record showing they made such a motion, we may treat the argument as waived.  (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115.)

[4]  At the end of her argument defendants' counsel stated they would "stand on [their] papers as well with regards to other issues in . . . defendants' motion."  There is no explanation as to what those other issues were.

22

excuse for nonperformance.  (*Plotnick v. Meihaus* (2012) 208 Cal.App.4th 1596, 1602.)
CRST did not do either here.  In fact it did not even include a copy of the contract in the appendix.  This alone is enough to defeat CRST's claim.

Further, plaintiff put on evidence showing CRST's lack of performance.  She claimed she was not allowed to engage in major city driving, receiving and responding to load assignments, and planning a trip, demonstrating a lack of proper training.  Therefore substantial evidence supports the jury's finding on the breach of contract cause of action.

**PLAINTIFF'S APPEAL**

*1.  Punitive Damages*

> *a.  Introduction*

After the jury awarded plaintiff not quite $1.174 million in punitive damages, the court granted defendants' motion for JNOV.  It found there was "insufficient clear and convincing evidence as to the issue of fraud, malice, oppression.  [¶] The Court [found] no despicable conduct was proven.  [¶] The Court [found] no cruel and unjust hardship or conscious disregard of the plaintiff's rights by the corporate defendants."  Plaintiff claims the court erred by granting the motion.  We agree.

"On appeal from the denial of a JNOV motion, this court reviews the record in order to make an independent determination whether there is any substantial evidence[,contradicted or not,] to support the jury's findings.  [Citations.]"  (*Murray's Iron Works, Inc. v. Boyce* (2008) 158 Cal.App.4th 1279, 1284.)  In so doing we must resolve any conflicts in the evidence in favor of the verdict.  (*In re Coordinated Latex Glove Litigation* (2002) 99 Cal.App.4th 594, 606.)

When a plaintiff proves sexual harassment, she may be entitled to recover punitive damages.  (Civ.Code, § 3294, subd. (a); *Weeks v. Baker & McKenzie* (1998) 63 Cal.App.4th 1128, 1159; *Peralta Community College Dist. v. Fair Employment & Housing Com.* (1990) 52 Cal.3d 40, 45 [punitive damages recoverable in FEHA action].)

23

Civil Code section 3294, subdivision (a) provides punitive damages may be awarded "for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."

Under Civil Code section 3294, subdivision (c)(1), "'Malice' means conduct which is intended by the defendant to cause injury to the plaintiff or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." "'Oppression'" means despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." (*Id.* subd. (c)(2).)

### b. Wilson's Liability

Applying those definitions here, the record shows Wilson acted with oppression and malice. Throughout the 28-day training period he made numerous unwelcome sexual advances from verbal statements to physical contact. His conduct was despicable, consciously disregarding plaintiff's rights to be free from such activity and subjecting her to unjust hardship. And it was severe, pervasive, or both. Wilson's conduct was more than enough to support an award of punitive damages against him.

### c. CRST's Liability

Civil Code section 3294, subdivision (b) limits the liability of a corporation to acts ratified or authorized or committed by a corporate officer, director, or managing agent. (See *Weeks v. Baker & McKenzie*, *supra*, 63 Cal.App.4th at p. 1151.)

A managing agent is limited to "only those corporate employees who exercise substantial independent authority and judgment in their corporate decisionmaking so that their decisions ultimately determine corporate policy." (*White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 566-567; *White*.) "[T]o demonstrate that an employee is a true managing agent . . ., a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business." (*Id.* at p. 577.) The scope of a corporate

24

employee's discretion and authority under our managing agent test is therefore a question of fact for decision on a case-by-case basis.  (*Ibid*.)

"'[R]atification' is the '[c]onfirmation and acceptance of a previous act.' [Citation.]"  (*Cruz v. HomeBase* (2000) 83 Cal.App.4th 160, 168.)  "For purposes of determining an employer's liability for punitive damages, ratification generally occurs where, under the particular circumstances, the employer demonstrates an intent to adopt or approve oppressive, fraudulent, or malicious behavior by an employee in the performance of his job duties.  [¶] The issue commonly arises where the employer or its managing agent is charged with failing to intercede in a known pattern of workplace abuse, or failing to investigate or discipline the errant employee once such misconduct became known.  [Citations.]"  (*College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 726.)

In *Birschtein v. New United Motor Manufacturing, Inc.* (2001) 92 Cal.App.4th 994, a FEHA case, the court cited with approval a federal court of appeals case, which stated:  "'Title VII does not permit employers to stand idly by once they learn that sexual harassment has occurred.  To do so amounts to a ratification of the prior harassment.' [Citations.]"  (*Id*. at p. 1007.)

The jury was instructed it needed to find that an officer, director or managing agent knew of "conduct constituting malice, oppression, or fraud and adopted or approved that conduct after it occurred."  Thus, to support the award of punitive damages against CRST the evidence had to show that a managing agent of CRST committed wrongful conduct or authorized or ratified Wilson's misconduct.

The verdicts show the jury determined Barnes exercised a managing agent's authority and ratified Wilson's malicious and oppressive acts by failing to prevent and correct workplace sexual harassment.  The record bears out these findings.

Barnes was the human resources director of a large nationwide company. The consolidated net worth of CRST International, Inc. at December 31, 2009 was just

25

under $271,800,000. The company controller testified to his knowledge the net worth would have gone up as of the date of his testimony in May 2011. CRST has offices in several locations throughout the country.

Among other things, Barnes was the one charged with investigating claims of sexual harassment. He determined the disciplinary actions to be taken and was not required to follow the disciplinary recommendations of lower level managers.

In *White*, *supra*, 21 Cal.4th 563, the court found a regional director who supervised 8 stores and 65 employees, who had the responsibility to manage "'most if not all'" of those stores, "had sufficient authority over corporate policy to be a 'managing agent.' There was a strong inference that a manager with these powers had authority to set corporate policies." (*Cruz v. HomeBase*, *supra*, 83 Cal.App.4th at p. 168.) Barnes had comparable if not more authority.

In addition, there was evidence of CRST's policy against sexual harassment, which documented how to prevent and correct harassment, deal with complaints, and take action. It also included provisions on how to conduct a thorough investigation of a harassment complaint. Plaintiff's expert, Michael Robbins, reviewed this policy and testified it was in line with industry standards and EEOC guidelines. However, in his opinion CRST did not take all reasonable steps to prevent harassment, including plaintiff's, and did not follow its own policies or standard practices in handling plaintiff's complaint.

Robbins testified that once a complaint is made, there must be a complete and thorough investigation. The investigator must have an open mind. He or she should meet with the complainant, obtain the names of and speak to all witnesses, and meet with the accused. It is important to interview people face to face to gauge the person's reactions and thus his or her credibility. This is especially important in a harassment case, which is usually a he said/she said situation. The interviews should be thorough and detailed notes should be taken.

Robbins also testified standard practice and EEOC guidelines provide the accuser should be interviewed, even if she has left the company. The CRST policy did not condition speaking to the complainant on continued employment. Once the investigation is completed, a determination as to what occurred should be made. This is important so appropriate action can then be taken. It is critical to take action. If there was harassment, the company may want to have additional antiharassment training and republish its policy. Employees need to know if they have complaints, the company will take them seriously and do something. Finally, once action is taken, the complainant should be told.

Robbins testified plaintiff had made several complaints of sexual harassment, beginning with her statement to Bruns that Cotter wanted a romantic relationship and that she had had problems with her trainer.

In her letter of resignation, plaintiff stated she did not want to be taken advantage of because she was female or be kicked off a truck because she did not sleep with her male codriver. She recounted another woman's statement a fleet manager had told her to seek out a codriver with whom she wanted to have a romantic relationship. Plaintiff also mentioned Wilson's tickling requests.

All of these were harassment complaints. There was no investigation at that point and neither Oetken nor Barnes conducted a thorough investigation when they later saw the letter.

At the time the EEOC charge was filed, Barnes became aware of plaintiff's complaints, including those set out in her resignation letter. He also saw Oetken's notes from her prior limited investigation. But when CRST received the EEOC charge it conducted only a minimal investigation. Oetken did not have an open mind. She had already determined plaintiff's complaints were not true, that her real concern was to avoid repaying the tuition. Neither Barnes nor Oetken spoke to plaintiff. They did not

seek out or interview any witnesses, including other women who had driven with Wilson, in violation of CRST's practice of doing so when a male driver is accused of harassment.

Barnes did not speak with Cotter, with whom plaintiff had driven for one day, until 2007, long after plaintiff filed her 2005 EEOC charge. He then learned plaintiff had told Cotter she thought Wilson "wanted to be more than friends." Barnes agreed that information might have been helpful if he had known about it during his investigation of plaintiff's complaint.

In connection with the EEOC charge Oetken, at Barnes's direction, spoke to Wilson, but it was not face to face. Moreover, the only question she asked was whether Wilson had touched plaintiff, which he denied. There were no questions about the specific charges made. Therefore, there was no way for CRST to make a determination as to what had occurred.

This is sufficient evidence to prove ratification. Plainly, CRST failed to properly investigate plaintiff's claims, in violation of its own policies. In so doing, CRST did not learn of all the instances Wilson sexually harassed plaintiff and thus imposed no discipline. Rather it "[stood] idly by" after learning of the charges. This amounted to, at minimum, sufficient approval to constitute ratification of Wilson's misconduct. Thus, punitive damages were properly awarded against CRST.

Defendants argue plaintiff had no right to an investigation because she never reported any problems with Wilson until after she left CRST and because CRST's investigation was sufficient.[5] They are wrong on both counts.

---

[5] In the introductory portion of their brief defendants raise as an issue whether it was error to instruct the jury CRST could be liable for insufficiently investigating plaintiff's claim even though she resigned before reporting the claim and before it could conduct an investigation. Other than a brief reference to the fact the instruction was given as part of their argument on this issue, defendants fail to argue error. Thus they have forfeited this claim. (*People v. Stanley* (1995) 10 Cal.4th 764, 793.)

As discussed above, the testimony of Robbins, Oetken and Barnes, and CRST's policy manual show CRST did not conduct a proper investigation, according to its own manual or standard practices. Further, there is no applicable law or evidence that once an employee leaves an investigation is unnecessary.

The cases defendants cite are inapt. Neither supports their position they had no duty to investigate once plaintiff left CRST's employ. One, *Dept. Fair Empl. Hous. v. Calolina Ginning Co. Inc.* (Feb. 3, 1999) FEHC Dec, No. 99-1, 1999 WL 169722, is merely a decision of an administrative body, which is not binding and which we do not find persuasive. It did not find the employer had not violated FEHA merely because the complainant had already quit. The decision was also based on the fact the complaint was vague, only that the accuser had been "'harassed,'" and that he "was forced off the job because of the work dispute that day." (*Id.* at pp. 10, 11.)

In the other, *Hicks v. Speedway SuperAmerica, LLC* (N.D. Ind. May 21, 2003, No. IP 01-0702-C M/S) WL 21314285, neither the facts nor the applicable law were at all comparable. The plaintiff's resignation went to the question of constructive discharge, not an issue here. (*Id.* at p. 7.)

Moreover, defendant's argument is a red herring. The issue to be decided is whether CRST's failure to investigate constituted evidence of a ratification of Wilson's conduct. Ratification is the blameworthy conduct subjecting it to punitive damages. Misconduct can be ratified at any time after it is discovered, whether or not plaintiff is still employed at that time.

2. *Attorney Fees*

    a. *Lodestar Amount*

In plaintiff's motion for attorney fees she argued $450 per hour was a reasonable rate to be used as the lodestar and submitted five declarations to support this claim. Two of the declarations were from plaintiff's lawyers who practice in the Bay Area. The other three declarations were from lawyers acting as expert witnesses. Two

29

practiced in the Bay Area; one was from San Bernardino. Defendants offered no declarations challenging this lodestar rate.

The trial judge set the lodestar rate at $350 based on his independent judgment, relying on his years on the bench and his time practicing in the Inland Empire and in Orange, Los Angeles, and Ventura Counties. His judgment was that $350 was the proper rate a reasonably competent attorney would charge for this type of case.

Plaintiff argues the court abused its discretion by ignoring her uncontroverted evidence $450 per hour was a reasonable rate. She relies on *Graciano v. Robinson Ford Sales, Inc.* (2006) 144 Cal.App.4th 140 (*Graciano*). In *Graciano*, the plaintiff sought attorney fees between $270 and $350 per hour for her three lawyers. One of her attorneys submitted a declaration supporting the attorney fees motion stating the rates were in line with those for comparable areas of practice. She also submitted two declarations from attorneys in the geographic area stating the requested rates were reasonable for that vicinity. The defendant did not oppose the rate. The court ordered a rate of $250 for all three attorneys based on a local rule setting the same rate for lawyers acting as expert witnesses.

The appellate court reversed the order and remanded for the court to conduct a new hearing. In so doing it noted the court made its order without "engag[ing] in the relevant objective analysis: to determine the prevailing rate in the community for comparable professional legal services, that is, services rendered by counsel on consumer fraud issues [citations]," but instead "arbitrarily relied upon what it considered to be a reasonable rate for generic expert attorney testimony fixed by [the] local rule." (*Graciano, supra,* 144 Cal.App.4th at p. 156, italics omitted.)

But that is not what happened here. Rather, the judge considered plaintiff's evidence. He just did not find it conclusive. One reason was that four of the attorneys filing declarations were from out of the area. The judge relied on his independent judgment and experience, especially in the Inland Empire, both as a judge trying cases

30

and as an attorney in practice.  Thus, contrary to plaintiff's argument and *Graciano*, here plaintiff's evidence was rebutted.  That defendants did not present contrary evidence is not dispositive.  *Graciano* did not rely on that fact alone.

As *Graciano* stated, "'Because the "experienced trial judge is the best judge of the value of professional services rendered in his court," we will not disturb the trial court's decision unless convinced that it is clearly wrong, meaning that it is an abuse of discretion.  [Citations.]'" (*Graciano*, *supra*,144 Cal.App.4th at p. 148.)  Plaintiff has not demonstrated the trial court was "clearly wrong."

We are not persuaded by the federal cases plaintiff cites.  Not only are they not binding on us (*Ritschel v. City of Fountain Valley* (2006) 137 Cal.App.4th 107, 120), some of their holdings are contrary to our state's law.  (E.g., *Coleman v. Kay* (3d Cir. 1996) 87 F.3d 1491, 1510 [judge cannot rely on personal knowledge and expertise if other evidence in record].)  "'[T]he fashioning of equitable exceptions' to the California rule that parties must bear their own costs 'is a matter within the sole competence of this court.' [Citation.]" (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1137.)

Further, the fact a $450 rate for another case in San Bernardino Superior Court was approved is not binding.  (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 896-897.)  Without some analysis of why the instant case is comparable, the fee rate in another case is irrelevant.  Moreover, the comment in *PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1096, that a Los Angeles County court did not err when it relied on a prevailing rate in San Francisco, does not mean the San Bernardino court is obligated to do so in this case.  Again, the issue is abuse of discretion.

The court relied on proper legal standards.  Thus we look to whether its decision "'"'falls within the permissible range of options set by the legal criteria.'"'" (*Robbins v. Alibrandi* (2005) 127 Cal.App.4th 438, 452.)  There is no basis to reverse unless "the amount awarded is so large or small that it shocks the conscience and

31

suggests that passion and prejudice influenced the determination." (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134.) There is nothing to suggest that here.

### b. *Multiplier*

Plaintiff also maintains the court erred when it failed to use a multiplier. She contends a multiplier was proper because of the risk she would not be awarded any fees and based on the five-year delay in payment.

In denying a multiplier, the court considered the declarations filed by plaintiff in which the declarants based their opinions about the complexity of the general nature of this kind of litigation. Although the facts were not easy, the court found they were not "the most complex facts that [c]ounsel could have been faced with." The court refused to take into account the fact plaintiff's lawyers were a two-person firm being opposed by a large firm, as plaintiff also had argued. Nor did it find persuasive that her attorneys' office was in Northern California. Finally, considering whether the case was unique or a matter of public interest that would support a multiplier, the court found it was not. The judge noted he saw FEHA cases involving sexual harassment "regularly."

Plaintiff argues that because her attorney fees were contingent the court must use a multiplier, citing *Ketchum v. Moses*, *supra*, 24 Cal.4th 1122. But *Ketchum* does not say that. Nor does any other case cited by plaintiff or that we have found. Rather, cases set out the factors that make it appropriate to use a multiplier, always, however, emphasizing it is within the court's discretion.

In *Ketchum*, for example, the court stated, "Of course, the trial court is not *required* to include a fee enhancement to the basic lodestar figure for contingent risk, exceptional skill, or other factors, although it retains discretion to do so in the appropriate case; moreover, the party seeking a fee enhancement bears the burden of proof." (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1138.)

32

Likewise although it is permissible to do so, there is no requirement the court apply a multiplier based on the delay in payment. (*Ketchum v. Moses*, *supra*, 24 Cal.4th at p. 1138; see also *Graham v. DaimlerChrysler Corp.* (2004) 34 Cal.4th 553, 583-584 ["significant delay" in payment a factor that may justify multiplier].)

Although we may have come to a different conclusion than the trial court, plaintiff has not shown the court abused its discretion in selecting the lodestar amount and in choosing not to apply a multiplier. Therefore, the attorney fees awarded were not improper.

## DISPOSITION

We reverse the order granting JNOV to CRST on the issue of punitive damages and direct the trial court to reinstate the jury's punitive damages verdict. In all other respects the judgment is affirmed. Plaintiff shall recover her costs on appeal.


THOMPSON, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.

33